**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONTAGUE WALKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SCI EMPLOYEE MANKEY, SCI | ) |
| EMPLOYEE MCWILLIAMS, SCI | ) |
| EMPLOYEE HENRY, SCI | ) |
| EMPLOYEE RHODES, SCI | ) |
| EMPLOYEE BOBECK, RN, SCI | ) |
| EMPLOYEE TRAYTER, SCI | ) |
| EMPLOYEE TERNITSKY- | ) |
| GORDON, DR. PAUL DASCANI, | ) |
| WEXFORD HEALTH SOURCES, | ) |
| INC., PENNSYLVANIA | ) |
| DEPARTMENT OF | ) |
| CORRECTIONS, an agency of the | ) |
| COMMONWEALTH OF | ) |
| PENNSYLVANIA, and JOHN DOES | ) |
| 1-10, | ) |
| | ) |
| Defendants. | ) |

Civil Action No.  14 – 1504

Magistrate Judge Lisa Pupo Lenihan

ECF Nos. 92 & 98

## MEMORANDUM OPINION

**LENIHAN, M.J.**

Presently before the Court is the Partial Motion for Summary Judgment filed by

Department of Corrections ("DOC") Defendants Mary Bobeck, Stanley Henry, Shelly Mankey,

Kenneth McWilliams, Robert Rhodes, Danielle Ternitsky-Gordon, and Tony Traytor

(collectively "DOC Defendants").[1]  (ECF No. 92.)  Also before the Court is the Motion for

---

[1] DOC Defendants concede that there are issues of material fact in dispute as to Plaintiff's medical malpractice claim against LPN Trayter and LPN Ternitsky and the related issue of causation.  (DOC Motion for Summary Judgment, ECF No. 92 at 2 n.2.)  Therefore, they do not move for summary judgment on these issues.

Summary Judgment filed by Defendants Paul Dascani, and Wexford Health Sources, Inc. ("Medical Contract Defendants") (ECF No. 98.)

This is a tragic case concerning Plaintiff, Montague Walker ("Plaintiff" or "Mr. Walker"), who was rendered a quadriplegic after falling from his bunk at the State Correctional Institution at Fayette ("SCI-Fayette"). For the reasons that follow, the motions will be granted in part and denied in part.

The Court will grant summary judgment as to all claims against Defendants Kenneth McWilliams, Stanley Henry, and Robert Rhodes. In addition, the Court will grant summary judgment on all Fourteenth Amendment claims against the remaining medical DOC Defendants. The Motion for Summary Judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to serious medical needs will be denied. The Motion for Summary Judgment relating to the state law negligence claim against RN Bobeck will be denied. As noted in the footnote above, Plaintiff's medical malpractice claims against LPN Trayter and LPN Ternitsky remain.

The Court will deny the Motion for Summary Judgment filed by Defendants Dr. Dascani and Wexford Health Sources, Inc.

**RELEVANT FACTS**

The following facts are taken from the DOC Defendants' and Plaintiff's Concise Statements of Material Fact and Responses thereto (ECF Nos. 94, 105, 103 & 116), and are undisputed unless otherwise indicated. In addition, certain facts are taken from the Medical Contract Defendants' and Plaintiff's Concise Statements of Material Fact and Responses thereto (ECF Nos. 100, 111, 109 & 118), and are undisputed unless otherwise indicated. Where necessary, the Court also looks to other relevant parts of the summary judgment record.

**Events at Plaintiff's Cell Immediately after Accident and Prior to Arrival of Medical**

On January 16, 2013, Plaintiff was an inmate at SCI-Fayette. (ECF Nos. 94 &105 ¶ 1.) On that day, Plaintiff was in the top bunk of his cell bunk bed when afternoon yard was called. (ECF Nos. 94 &105 ¶ 2.) Plaintiff attempted to jump down off the bunk, but his feet became tangled in his sheets and he fell, head first, striking his head on the floor. (ECF Nos. 94 &105 ¶ 3.) Plaintiff could not free his arms to break his fall. (ECF Nos. 94 &105 ¶ 4.)

Defendant Officer McWilliams was the first person to arrive at the scene after Plaintiff's fall, at approximately 1:25 pm. (ECF Nos. 94 &105 ¶ 6.) Officer McWilliams had been making rounds and was walking up the stairs towards Plaintiff's cell when he heard Plaintiff saying, "Help me." (ECF Nos. 94 &105 ¶ 7.) Officer McWilliams went to Plaintiff's cell, looked in the window, and saw him lying on the floor. (ECF Nos. 94 &105 ¶ 8.) Plaintiff was lying on his back with his head towards the toilet and door and his feet near or under the table/desk and his sheet on top of him. (ECF Nos. 94 &105 ¶ 9.) Plaintiff's legs and lower torso were twisted and appeared tangled. (ECF Nos. 94 &105 ¶ 10.) Plaintiff's mattress was also on the floor. (ECF Nos. 94 &105 ¶ 11.) Plaintiff's left arm was beside his head, and his right arm was under his body. (ECF Nos. 94 &105 ¶ 12.) Plaintiff's position appeared to be very awkward. (ECF Nos. 94 &105 ¶ 13.) When he saw Plaintiff on the floor, Officer McWilliams immediately radioed for Plaintiff's cell door to be opened and McWilliams went inside. (ECF Nos. 94 &105 ¶ 14.) Plaintiff told Officer McWilliams that he was attempting to climb out of bed when he fell and hit his head on the floor of his cell. (ECF Nos. 94 &105 ¶ 15.) According to Officer McWilliams, Plaintiff told Officer McWilliams that he could not move his legs. (ECF No. 94 ¶ 16.) The parties dispute, however, whether Plaintiff could move his arms and legs immediately after Plaintiff fell from his bunk. (ECF Nos. 94 & 105 ¶ 16.) Plaintiff states repeatedly in his

deposition that he could move his arms and legs after the fall but before he was placed on the stretcher, (Walker Dep., ECF No. 106-1 at 2-3, 5-7, 9, 11)[2] while others testified or stated that they either were told by Plaintiff that he could not move or feel one or more of his extremities immediately after the fall, or they did not observe Plaintiff move when interacting with him (McWilliams Dep., ECF No. 95-1 at 24, 26, 33; McWilliams Incident Report, ECF No. 95-2 at 2; Freeman Dep., ECF No. 95-8 at 21, 26; Mankey Dep., ECF No. 95-3 at 43, 55, 56, 69, 76-77; Mankey Statement, ECF No. 95-5 at 2; Rhodes Dep., ECF No. 95-6 at 28; Trayter Dep., ECF No. 95-13 at 58-59).

Officer McWilliams did not touch Plaintiff and told him not to move. (ECF Nos. 94 & 105 ¶ 17.) He immediately made a radio call to non-defendant Officer Plumley in the unit control bubble to call medical. (ECF Nos. 94 & 105 ¶ 19.) Upon hearing Officer McWilliams' call, Defendants Unit Manager Mankey, Counselor Rhodes, and Officer Henry went directly to the cell. (ECF Nos. 94 & 105 ¶ 20.) Non-defendant Sergeant Freeman had been in the control bubble with Officer Plumley when he heard Officer McWilliams call, and he immediately went to Plaintiff's cell. (ECF Nos. 94 & 105 ¶ 21.) Sergeant Freeman also radioed to Officer Plumley to notify the medical department because Plaintiff was lying on the floor. (ECF Nos. 94 & 105 ¶ 23.) When Unit Manager Mankey and Counselor Rhodes arrived at Plaintiff's cell, they saw him lying on the floor. (ECF Nos. 94 & 105 ¶ 24.) Mankey told Plaintiff not to move his head and that medical was on its way. (ECF Nos. 94 & 105 ¶ 33.) Mankey and the officers never moved or touched Plaintiff when he was lying in his cell; their job was to provide first-aid until medical personnel were present. (ECF Nos. 94 & 105 ¶ 40.)

---

[2] In addition, in an April 8, 2015 statement, LPN Trayter indicated that Plaintiff had movement of his extremities in his cell. (Trayter Dep. ECF No. 104-9 at 15-16.) *But see* Trayter Dep., ECF No. 95-13 at 58-59 (Plaintiff said "I can't move my arms and legs.")

## LPNs Trayter and Ternitsky Respond to the Emergency Call

LPNs Trayter and Ternitsky arrived at Plaintiff's cell. (ECF Nos. 94 & 105 ¶ 41.) LPN Trayter believes that they had been told that an inmate fell from the top bunk and was lying on the floor, so they took a collar as a precaution. (ECF Nos. 94 & 105 ¶ 55.) They also grabbed a stretcher when leaving medical. (ECF Nos. 94 & 105 ¶ 56.) They both recall seeing Mr. Walker lying on the floor beside the bunks. (ECF Nos. 94 & 105 ¶ 58.) The first thing Trayter recalls doing was to see if Mr. Walker was conscious and breathing, which they did by asking questions and looking for respirations. (ECF Nos. 94 & 105 ¶ 61.) Plaintiff was conscious and responded appropriately. (ECF Nos. 94 & 105 ¶ 62.) LPN Ternitsky recalls asking Plaintiff what happened, and he responded that he had fallen from getting tangled in his sheets. (ECF Nos. 94 & 105 ¶ 63.) LPN Trayter remembered asking him what had happened, whether he was in pain, and Plaintiff indicated he had pain in his neck. (ECF Nos. 94 & 105 ¶ 64.) One of the LPNs conducted a Babinski test[3] on Mr. Walker's foot and it was negative. (ECF Nos. 94 & 105 ¶ 67.)

The LPNs intended to transfer Mr. Walker back to the triage facility in medical so that the doctor could further assess him. (ECF Nos. 94 & 105 ¶ 68.) LPN Trayter generally recalls using a blanket to slide Plaintiff enough to get him onto the stretcher in the cell. (ECF Nos. 94 & 105 ¶ 69.) Trayter recalls that they used a log roll procedure, with one person stabilizing the head while the other grabbed Mr. Walker's shoulder and hip, and rolled Mr. Walker onto his side so that a blanket could be placed underneath him. (ECF Nos. 94 & 105 ¶ 70.)

The LPNs had brought a collar to the cell. (ECF Nos. 94 & 105 ¶ 89.) At some point, LPN Ternitsky or LPN Trayter would have had staff call to medical for more collars since RN

---

[3] LPN Trayter explained that a Babinski test is a test on the bottom of the foot to test for feeling. (Trayter Dep., ECF No. 95-13 at 59.)

Filcheck appears on a video[4] with more supplies as Mr. Walker is being carried down the steps. Since Filcheck's appearance indicates a call was made to medical for more collars/supplies, Ternitsky believes she or Trayter must have attempted to put the collar they brought with them on Plaintiff but it did not fit. Plaintiff himself recalls medical staff trying to fit a collar on while he was in the cell, and that it did not fit. (ECF Nos. 94 & 105 ¶¶ 90-92.) The nurses were in the cell for over eight (8) minutes, and then carried Plaintiff out of the cell. (ECF Nos. 94 & 105 ¶¶ 71-72.)

It was a tight fit to get Plaintiff out of the hallway outside the cell, and Plaintiff was a big man. (ECF Nos. 94 & 105 ¶ 74.) Plaintiff testified that it felt like the "backboard" broke and it felt like he was dropped to the floor. Defendants deny that Plaintiff was dropped or slammed to the ground, but instead contend that the LPNs carried Plaintiff on his stretcher low to the ground and occasionally placed him on the ground in an easy manner as they maneuvered him out of the cell. (ECF Nos. 94 & 105 ¶¶ 82-83.) Defendant Henry, a DOC guard, testified that when LPNs Trayter and Ternitsky were carrying Plaintiff out of the cell head-first, no one was holding Plaintiff's head. (ECF Nos. 103 & 116 ¶ 51.) Similarly, Henry testified that when the LPNs put Plaintiff on the ground, no one was holding his head, and that no one was holding his head when they picked him up to try and take him out of his cell again. Henry indicated that the LPNs manipulated and tried to turn the stretcher by going into the hot water closet and then back into the cell two or three times, and that no one was holding Plaintiff's head at this time. (ECF Nos. 103 & 116 at¶¶ 54-57. The parties agree that the stretcher "sagged." (ECF Nos. 94 & 105 ¶¶ 82-83.)

The video evidences that as Plaintiff was being carried down the stairs, he did not have on a collar or brace, his head was not stabilized, and no one was holding his head. (ECF Nos. 94

---

[4] Doc Defendants' Exhibit 18 is a Pod Video of Plaintiff's unit on January 16, 2013.

& 105 ¶ 88; Video, DOC Defendants' Exhibit 18 at 12:17-12:45.)[5]  According to DOC RN supervisor Kenneth Randolph, the standard of care regarding the type of board used to carry Plaintiff out of the cell would have been a solid backboard, rather than a canvas stretcher, to protect Plaintiff from further injury.  Randolph further testified that if LPNs Ternitsky and Trayter were unsure of Plaintiff's treatment under the circumstances, according to DOC guidelines and protocols, they would be expected to call and either speak to the supervisor or another nurse for guidance.  (Dep. of K. Randolph, ECF No. 104-5 at 11, 15-17.)

At the bottom of the stairs, after placing Plaintiff on the wheeled gurney, LPN Ternitsky tried to fit one of the other collars that nurse Filcheck had brought.  (ECF Nos. 94 & 105 ¶ 100.) The Plaintiff disputes Defendants' statements that none of the collars would work so Ternitsky had to use CID blocks.  (ECF Nos. 94 & 105 ¶¶ 101-02.)  Based on her experience and practice, LPN Ternitsky would have continued to monitor and assess Plaintiff's medical condition as he was being moved to medical.  LPN Trayter recalls continuing to assess Plaintiff during this time to make sure he was breathing.  (ECF Nos. 94 & 105 ¶¶ 101-02.)

The DOC Training Academy basic first aid training documents provide:

> a) Upon completion of this training program, a student will be able to describe how to recognize and provide first aid treatment for a head, neck, or back injury.

> b) Upon completion of this training program, a student will be able to correctly demonstrate how to stabilize a suspected head, neck, or back injury.

> c) When the body suffers a significant force, such as from a high fall, shooting, or motor vehicle crash, serious injury can result, most notably to the spine.

---

[5]Plaintiff notes that initially, LPN Trayter indicated that Plaintiff was wearing a collar as he was carried out of the cell, and later changed his account when shown the video of the incident.

d) Injury to the spinal cord can result in permanent paralysis or in a life-threatening condition, such as the loss of breathing.

e) After an initial injury, movement of damaged spinal bones can result in additional injury to the spinal cord.

f) If a significant mechanism of injury occurred, it is best to assume a spinal injury exists.

g) Stabilize Head:
- Get into a comfortable position behind the person.
- Cup your hands on both sides of the head, without covering the ears, to manually stabilize it.
- Keep the head, neck, and spin[e] in line. Minimize any motion of head, neck, and back.
- Comfort, calm, and reassure the person.

(Pl.'s Exh. 3, PA DOC In-Service Training Academy Basic First Aid Excerpts, ECF No. 104-3 at 3-6, 8.)  LPN Trayter testified that he received training every year from the DOC regarding the assessment of a patient with a potential head, neck or spinal cord injury and the protocols to follow.  (Trayter Dep., ECF No. 104-8 at 24-28.)  LPN Ternitsky testified that she also received this annual first aid training.  (Ternitsky Dep., ECF No. 95-15 at 72.)

## Assessment at the Medical Department

Wexford Health Sources, Inc. ("Wexford") was under contract with the DOC from January 1, 2013 through August 31, 2014 to provide medical staff to treat inmates.  (ECF Nos. 100 & 111 ¶ 1.)  From 2009-2012, Dr. Dascani was employed by Corizon, and was then hired by Wexford upon the termination of the Corizon contract with the DOC.  (ECF Nos. 100 & 111 ¶ 3.)  After Mr. Walker's fall, neither LPN Trayter nor LPN Ternitsky notified Dr. Dascani prior to or during the time they were at Mr. Walker's cell.  (ECF Nos. 100 & 111 ¶¶ 9-11.)  Instead, the nurses determined that they would transfer Mr. Walker back to the triage facility within the

medical department so the doctor could perform a further assessment on Plaintiff. (ECF Nos. 100 & 111 ¶ 12.)

In triage, Plaintiff was lying on a stretcher when Defendant RN Bobeck first saw him. LPN Trayter believes that Dr. Dascani came into the triage room in medical within a minute after they arrived with Plaintiff, followed by RN Bobeck. Trayter recalls talking to RN Bobeck briefly to give her a rundown of what had happened. (ECF Nos. 94 & 105 ¶¶ 110-12.) Nurse Trayter advised Dr. Dascani that Mr. Walker had neck pain and provided details on the actions taken to get Mr. Walker to the medical department. (ECF Nos. 100 & 111 ¶ 17.)

Dr. Dascani assessed Plaintiff in the triage room at approximately 2:05 p.m. (ECF Nos. 94 & 105 ¶ 113.) While in the triage room, Plaintiff was on a stretcher/backboard with the CID blocks placed around his head. (ECF Nos. 94 & 105 ¶ 114; Video, DOC Defendants' Exhibit 18 at 14:39.)

Dr. Dascani recalls asking Plaintiff if he could feel him touching his feet, shoulders, and hands. Dr Dascani tried to elicit a Babinski sign and asked Plaintiff where he was hurt. He remembers Plaintiff complaining of pain when Dr. Dascani palpated his neck. (Dascani Dep., ECF No. 95-12 at 5.) Dr. Dascani recalls that Plaintiff told him he could not feel Dr. Dascani touching him. (Dascani Dep., ECF No. 95-12 at 6-7.) Dr. Dascani also noted that Plaintiff was not moving his extremities, neither arms nor legs. (Dascani Dep., ECF No. 95-12 at 12-13.) RN Bobeck watched Dr. Dascani assess Plaintiff. (ECF Nos. 94 & 105 ¶ 120.) According to the Medical/Injury Report prepared by RN Bobeck, the "[i]nmate stated: I fell out of my bunk and can't feel anything."[6] (ECF No. 95-11 at 2.) Plaintiff responds that he has no memory of what occurred in triage and has no memory of seeing Dr. Dascani. (ECF No. 105 ¶ 121.) Nurse

___

[6] It is RN Bobeck's practice to fill out the evaluation while Dr. Dascani's assessment was going on. (ECF Nos. 94 & 105 ¶ 124.)

Bobeck called the ambulance to take Plaintiff to an outside hospital at Dr. Dascani's direction. (ECF Nos. 94 & 105 ¶ 126.) The Brownsville Ambulance Service was dispatched to SCI-Fayette at 2:07p.m. (ECF Nos. 100 & 111 ¶ 21.) The EMTs arrived at SCI-Fayette at 2:21 p.m. (ECF Nos. 100 & 111 ¶ 22.) Dr. Dascani's provisional diagnosis for Mr. Walker was "high spinal injury" and a potential "C5 fracture." (ECF Nos. 109 & 118 ¶ 114.) He testified that he probably left Mr. Walker before he was stripped and searched. (ECF Nos. 109 & 118 ¶ 118.)

Non-defendant EMT Tammy Impiccini testified that when she arrived in medical at SCI-Fayette, Plaintiff was on a gurney with CID blocks. (Impiccini Dep., ECF No. 104-15 at 4.) Mr. Walker's neck was not properly immobilized and no one was holding his neck. (Impiccini Dep., ECF No. 104-15 at 7.) She asked if she could begin caring for the patient but was refused because they had not yet strip searched him and changed his clothes as required by DOC protocol.[7] (Impiccini Dep., ECF No. 104-15 at 4.) When she felt "things were getting moved way out of control for a fall of this magnitude," she did intervene and "hold C spine on him and [] got a collar on him." (Impiccini Dep., ECF No. 104-15 at 4.) Specifically, she noted that when "they started trying to change his clothes and wiggling all over the place, I went over and I grabbed his neck." (Impiccini Dep., ECF No. 104-15 at 7.) No one attempted to intervene and stop the guards from moving and pulling on Plaintiff as they attempted to dress him in the orange jumpsuit transport clothes. (Impiccini Dep., ECF No. 104-15 at 9-10.) She indicated that only when she requested that the guards stop at his waist so as to "leave his upper torso alone, did they agree to do so." (Impiccini Dep., ECF No. 104-15 at 10.) She testified that the C collar would prevent any further injury. (Impiccini Dep., ECF No. 104-15 at 6-7.) No one from the

---

[7] The DOC "Transportation of Offenders" document provides that "[a]n offender scheduled for transport is strip searched by the transport team prior to being placed in restraints, and placed in the transportation vehicle. In an emergency situation (medical transport by ambulance) only, the Shift Commander may waive the strip search requirement." (ECF No. 104-13 at 5.)

nursing staff assisted her in any way to stabilize Plaintiff's neck. (Impiccini Dep., ECF No. 104-15 at 10.)

Generally, any inmate who leaves SCI-Fayette is required to be strip searched before he leaves the institution. The shift commander, however, based on a medical recommendation, is permitted to modify or waive the strip search requirement. (ECF Nos. 94 & 105 ¶¶ 127-28.) Any medical personnel could make the call to the shift commander about potentially waiving or modifying the strip search requirement, but generally, the person at the top of the clinical hierarchy would make the determination. (ECF Nos. 94 & 105 ¶¶ 129-130.)

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non- movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added

by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

**LEGAL ANALYSIS**

<u>**DOC DEFENDANTS**</u>

As a preliminary matter, the Court notes that Plaintiff withdraws all of his claims against the non-medical DOC Defendants.  Therefore, the Court will grant summary judgment as to all claims against Defendants Kenneth McWilliams, Stanley Henry, and Robert Rhodes.

In addition, Plaintiff concedes his Fourteenth Amendment claims against all Defendants. Therefore, the Court will grant summary judgment on all Fourteenth Amendment claims against the remaining medical DOC Defendants, and only the § 1983 Eighth Amendment claims against the medical DOC Defendants Trayter, Ternitsky and Bobeck remain.[8] [9] Also, as to DOC Defendant Bobeck, the state law claim remains, which is discussed, *infra*.

<u>SECTION 1983 EIGHTH AMENDMENT CLAIMS AGAINST
TRAYTER, TERNITSKY and BOBECK</u>

Section 1983 of the Civil Rights Act provides as follows:

---

[8] As noted above, the DOC Defendants did not move for summary judgment on the Plaintiff's state medical malpractice claims against LPN Trayter and LPN Ternitsky.

[9] The DOC Defendants contend that Defendant Bobeck is a non-medical Defendant because her actions do "not implicate any medical treatment decisions or nursing care."  (ECF No. 93 at 24.) Record evidence reflects, however, that she was involved with Plaintiff's medical care in triage.

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or any other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

The Eighth Amendment protects individuals against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This protection, enforced against the States through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement. In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

In the context of medical treatment, an inmate must prove two elements: (1) that he was suffering from a "serious medical need," and (2) that prison officials were deliberately indifferent to the serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The first showing requires the court to objectively determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a

physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzara*, 834 F.2d 326, 347 (3d Cir. 1987). The DOC Defendants do not dispute that Plaintiff's medical needs were serious. (Brief in Support of Partial Motion for Summary Judgment, ECF No. 93 at 3.)

The second prong requires a subjective determination by the court as to whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993). A prisoner must demonstrate that the official acted with more than mere negligence. *Estelle*, 419 U.S. at 105. To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837. It is a "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990). Moreover, "[a] court may not substitute its own judgment for diagnosis and treatment decisions made by prison medical staff members." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

Recently, the United States Court of Appeals for the Third Circuit focused on the deliberate indifference standard where the complaint alleges an Eighth Amendment violation due to inadequate medical treatment. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535-36 (3d Cir. 2017). The court of appeals noted that "when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id.* at 535 (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is

well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights").  The court continued as follows:

> [T]he mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care.  *Durmer*, 991 F.2d at 69 n.13 (noting a plaintiff can only proceed to trial when there is a genuine issue of fact regarding both the adequacy of medical care and the defendant's intent).  This observation is critical because it makes clear that there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim.  The first is the adequacy of the medical care—an objective inquiry where expert testimony could be helpful to the jury.  The second is the individual defendant's state of mind—a subjective inquiry that can be proven circumstantially without expert testimony.

*Pearson*, 850 F.3d at 535-36.

Here, with regard to the objective prong of the deliberate indifference analysis as it specifically relates to an inadequacy of care claim, Plaintiff has come forward with sufficient evidence for a reasonable jury to conclude that the DOC medical Defendants did not exercise professional judgment.  Specifically, Plaintiff has come forward with the report of Gordon R. Bouchard, RN, BSN, CCHP, which highlights the actions and inactions of LPNs Trayter and Ternitsky and RN Bobeck.  Relying on numerous depositions and reports of record, Bouchard lists those actions and inactions of these DOC medical Defendants that do not follow proper nursing practices and are not those of a reasonably prudent nurse in a corrections environment.  Therefore, Plaintiff has raised a genuine issue of material fact as to whether these Defendants exercised professional judgment in providing medical care to Mr. Walker.

Next, with regard to the subjective prong of the deliberate indifference analysis as it relates to an inadequacy of care claim, Plaintiff has come forward with sufficient evidence for a reasonable jury to conclude that the DOC medical Defendants acted with a sufficiently culpable

state of mind, that is, with deliberate indifference. The DOC medical Defendants all testified

that they were trained annually by the DOC in basic first aid training. (Trayter Dep., ECF No.

104-8 at 24-28; Ternitsky Dep., ECF No. 95-15 at 72; Bobeck Dep., ECF No. 95-9 at 38-43.)

This first aid training specifically addressed first aid treatment for a head, neck, or back injury.

They were instructed how to stabilize a suspected head, neck, or back injury and how to predict

when such injuries could occur. This specific instruction included the fact that injury to the

spinal cord can result in permanent paralysis and that after an initial injury, movement of

damaged spinal bones can result in additional injury to the spinal cord. Moreover, the training

set out how to stabilize the head in the absence of stabilizing medical devices. (Pl.'s Exh. 3, PA

DOC In-Service Training Academy Basic First Aid Excerpts, ECF No. 104-3 at 3-6, 8.)

Yet, the record reflects that the DOC medical Defendants disregarded this training and

subjected Plaintiff to the serious consequences that can result from not properly immobilizing the

head after a spinal cord injury. Moreover, the record reflects no reason as to why the DOC

medical Defendants could not, in the absence of appropriate medical equipment, immobilize

Plaintiff's head at all times with their hands. Nor does the record reflect any reason why the

LPNs could not have grabbed a solid backboard to carry plaintiff out of his cell rather than a

canvas stretcher. Similarly**,** Defendant Bobeck looked on as DOC personnel stripped Mr.

Walker without his head properly immobilized. It was not until EMT personnel intervened that

Mr. Walker's head was properly immobilized. In light of the obvious dangers inherent in their

actions and inactions, the court must leave the determination of the scienter requirement for the

jury. As noted by the court of appeals in *Pearson*, "deliberate indifference is a subjective state of

mind that can, like any other form of scienter, be proven through circumstantial evidence and

witness testimony." 850 F.3d at 535 (citing *Durmer*, 991 F.2d at 69 (noting that, when "intent

becomes critical," it is "important that the trier of fact hear" the defendant's "testimony in order to assess his credibility")).

Therefore, the Court will deny the medical DOC Defendants' Motion for Summary judgment on Plaintiff's Eighth Amendment claim.

NEGLIGENCE CLAIM AGAINST RN BOBECK

Defendants move for summary judgment regarding the negligence claim against its Commonwealth employee RN Bobeck, and argue that because she was not acting in a medical capacity, she is protected by state sovereign immunity pursuant to 1 Pa. C.S. § 2310.[10]  As the summary judgment record reflects, however, Bobeck was involved in the delivery of medical care to Mr. Walker.  Because Plaintiff has raised an issue of material fact as to whether RN Bobeck was deliberately indifferent to the serious medical needs of Mr. Walker, Plaintiff has necessarily raised an issue as to whether she was negligent.  The DOC Defendants' Motion for Summary Judgment on Plaintiff's state law negligence claim against RN Bobeck must be denied.

**DR. DASCANI AND WEXFORD HEALTH**

Dr. Dascani and Wexford Health ("Medical Contract Defendants") move for summary judgment and argue the following: 1) Plaintiff has failed to come forward with expert medical testimony establishing the requisite causal link between Dr. Dascani's conduct and Plaintiff's injuries as required to establish a prima facie case of medical malpractice; 2) Dr. Dascani provided Plaintiff with constitutionally appropriate care under the Eighth Amendment; and 3) Plaintiff has failed to come forward with evidence to establish a prima facie case of corporate negligence against Wexford Health.

---

[10] An exception to sovereign immunity exists for Commonwealth employees who are health care professionals.  42 Pa. C.S. § 8522(B)(2).

With regard to their first argument, the Medical Contract Defendants contend that the expert report of Dr. Vaccaro "places the causation of Plaintiff's injury on the fall from the top bunk and the transportation of Mr. Walker from his cell to the medical department." (Brief in Support of Motion for Summary Judgment, ECF No. 99 at 3.) A careful review of Dr. Vaccaro's report reveals that the Medical Contract Defendants' argument is premised upon a very narrow reading of the report. Specifically, Dr. Vaccaro's report provides in relevant part as follows:

> The lack of immediate immobilization in the cell before Mr. Walker was moved from the floor to the stretcher was the proximate cause of and increased the risk of a significant progression of neurologic loss resulting in lack of movement to his upper and lower extremities and the conditions identified in the report of Dr. Harrington, some of which have only minimally improved since his surgical intervention. *The initial traumatic injury to the spinal cord is referred to as the primary insult. It is imperative that the cervical spine be immobilized to prevent or minimize the secondary cascade of injury which results in the release of harmful inflammatory mediators and further compromise of the blood supply to the spinal cord.* Mr. Walker's situation in his cell *and in triage* obviously represented an immediate and serious medical need. It was obvious that this lack of cervical spine immobilization in the cell resulted in a man who had initially had the ability to move his extremities to a situation of significant neurologic loss resulting in quadriplegia.

(Expert Report of Alexander R. Vaccaro, ECF No. 100-9 at 4) (emphasis added). Here, the report makes clear the importance of keeping the cervical spine immobilized to prevent or minimize the secondary cascade of injury. The Medical Contract Defendants' insistence that Plaintiff was already rendered a quadriplegic upon arrival in triage will not negate the fact that the failure to maintain cervical spine immobilization could cause further secondary injury to Plaintiff. Therefore, the Medical Contract Defendants' attempt to show an absence of causation based upon the Vaccaro report must necessarily fail.

Next, with regard to the argument that Dr. Dascani provided Plaintiff with constitutionally appropriate care under the Eighth Amendment, Plaintiff has raised genuine issues of material fact as to whether Dr. Dascani was deliberately indifferent to the serious medical needs of Mr. Walker. Concerning the objective prong of the deliberate indifference analysis as it relates to an inadequate care claim, *Pearson*, 850 F.3d at 535-36, Plaintiff has come forward with sufficient evidence for a reasonable jury to conclude that Dr. Dascani did not exercise professional judgment. Specifically, Plaintiff has presented the report of Robert D. Powers MD MPH, which highlights the actions and inactions of Dr. Dascani. Relying on numerous depositions and reports of record, Powers lists those actions and inactions of Dr. Dascani that did not follow proper practices and are not those of a reasonably prudent physician in a corrections environment. Therefore, Plaintiff has raised a genuine issue of material fact as to whether Dr. Dascani exercised professional judgment in providing medical care to Mr. Walker.

With regard to the subjective prong of the deliberate indifference analysis as it relates to an inadequacy of care claim, Plaintiff has come forward with sufficient evidence for a reasonable jury to conclude that Dr. Dascani acted with deliberate indifference. As a physician, Dr. Dascani would have known that Plaintiff's neck was not properly immobilized when he came into triage, but did nothing to correct the improper immobilization so as to prevent further injury. Similarly, in light of the serious nature of Plaintiff's injuries that were known to Dr. Dascani in triage, Dr. Dascani failed to supervise Plaintiff's care until EMT's arrived. Likewise, he failed to limit, per his authority, the actions of DOC personnel when preparing Mr. Walker for transport to an outside medical facility. Although Dr. Dascani denies that he was aware of his power to modify or waive the strip search security requirement, record evidence reflects that Dr. Dascani worked for four years at four different state correctional facilities before beginning work at SCI-Fayette,

and would be expected to know the waiver procedure policy. In light of the obvious dangers inherent in his actions and inactions, the court must leave the determination of the scienter requirement for the jury. Therefore, the Court will deny the Motion for Summary Judgment as it relates to the Eighth Amendment claim against Dr. Dascani.

Although not argued in the Contract Medical Defendants' moving brief, and mentioned only briefly in their Reply, Plaintiff raises a disputed issue of material fact as to whether Wexford Health was deliberately indifferent to the serious medical needs of Plaintiff through its failure to train Dr. Dascani. "To survive summary judgment on a failure to train theory, [Plaintiff] must present evidence that that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the [Defendant's] failure to respond amounts to deliberate indifference." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001). Here, Plaintiff has come forward with evidence that Wexford Health failed to train its personnel as to the handling of a patient with a suspected neck injury, and how to seek a waiver of the strip search requirement for patients being transported to outside medical facilities whose health would be compromised by the strip search procedure. Record evidence is clear that Dr. Dascani was unaware of these protocols. Instead, he testified that he did not interfere with DOC security personnel in all instances. With knowledge of his authority to waive or modify the strip search requirement, Dr. Dascani may have taken a more active role with regard to Plaintiff's preparation for transport.

Finally, with regard to Plaintiff's claim of corporate negligence against Wexford Health, Plaintiff has come forward with genuine issues of material fact from which a reasonable jury could return a verdict in Plaintiff's favor on this issue. In order to survive summary judgment on Plaintiff's claim of corporate negligence, Plaintiff must come forward with evidence that

Wexford Health failed to enforce its own rules and policies to ensure quality care for its patients at SCI-Fayette, and that its negligence was a substantial factor in bringing about the harm to Plaintiff. *See Thompson v. Nason Hosp.*, 591 A.2d 703, 707-08 (Pa. 1991). Defendant Wexford Health argues that summary judgment is appropriate on this issue because Plaintiff has failed to produce expert testimony that it deviated from an accepted standard of care and that the deviation was a substantial factor in causing harm to Plaintiff.

Record evidence reflects the contrary. Plaintiff has come forward with the expert report of Robert D. Powers wherein he opines that "Dr. Dascani's employer failed to adequately train and orient Dr. Dascani as to the policies and procedures which would have allowed him to request a waiver of the strip search and re-dressing of Mr. Walker prior to transport." (ECF No. 100-10.) This report, in conjunction with the expert report of Dr. Vaccaro which establishes the importance of keeping "the cervical spine [] immobilized" after the primary insult "to prevent or minimize the secondary cascade of injury" (ECF No. 100-9 at 4), raise a genuine issue of material fact as to Wexford Health's corporate negligence. Record evidence is clear that Wexford Health was responsible for providing medical care within SCI-Fayette at the time of Plaintiff's injury. The Wexford Provider Handbook provides in relevant part:

> This handbook is designed to acquaint you with Wexford Health Sources, Inc. and provide you with general information regarding your role as a physician within the correctional health care setting.
>
> . . .
>
> IV. **Correctional Staff**
> Cooperation with the correctional staff is expected and necessary. . . . Every institution has a set of DOC/county policies, usually called administrative directives as well as Wexford's own set of operational policies. In both case[s], some of the policies apply to the medical and mental health services. *You must be familiar with all of these policies.*
>
> . . .
>
> Security is the prime objective of all prison operations, and you are expected to understand and respect that responsibility. Security is

the first issue of concern to most correctional staff. *On occasion, security and health service are in conflict. These issues must be addressed on an individual basis. Decisions of this nature require your use of reasonable judgment. We depend on you to understand both the medical and security roles.*

(Wexford Health Provider Handbook, ECF No. 110-10) (emphasis added). Clearly, Wexford Health understood the importance of its physicians' understanding of the appropriate balance between security concerns within the prison, and the delivery of appropriate medical care to inmates, especially in emergency situations like that confronting Mr. Walker. In their moving brief, the Contract Medical Defendants suggest that because Wexford Health's contract had commenced only two weeks before Plaintiff's fall, that they are somehow excused from what the record reflects was a total lack of training or understanding concerning the waiver/modification of the strip search requirement. Yet, in its Operations Policies and Procedures, its Emergency Services protocol requires that "[H]ealth care staff will be oriented to Emergency Services at the time of their initial orientation." (ECF No. 110-15 at 3.) Record evidence reflects that no such orientation occurred.

Therefore, the Court will deny the Medical Contract Defendants' Motion for Summary judgment on all claims.

**CONCLUSION**

For the foregoing reasons, the Court will grant summary judgment as to all claims against Defendants Kenneth McWilliams, Stanley Henry, and Robert Rhodes. In addition, the Court will grant summary judgment on all Fourteenth Amendment claims against the remaining medical DOC Defendants. The medical DOC Defendants' Motion for Summary Judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to serious medical needs will be

denied. The Motion for Summary Judgment relating to the state law negligence claim against RN Bobeck will be denied.

Finally, the Court will deny the Motion for Summary Judgment filed by Defendants Dr. Dascani and Wexford Health Sources, Inc.

An appropriate Order will follow.

Dated: March 28, 2018

BY THE COURT

LISA PUPO LENIHAN
United States Magistrate Judge

cc: All Counsel of Record
Via Electronic Filing